## Henry Eisner v. George F. Keller.

The legal effect of taking from the maker of a note or bill, a new note, payable at a future day, is to suspend the right of action on the first note until the maturity of the second, and such taking is an extension of credit which operates to discharge from liability an indorser of the first note, not assenting to the transaction.

To effect such discharge from liability, it is not necessary that there should be an agreement, either express or implied, between the debtor and the creditor, to give time. The taking of a new note for the same amount, payable at a future day, necessarily implies an extension of credit by the creditor.

*It seems* that an express understanding that the new note should not affect the security of the first note, will be sufficient evidence of an agreement that there was to be no extension of time, and that the creditor might be at liberty to sue upon the first note before the maturity of the new note.

The maker of an over due note, at the request of the holder, procured from a third person a note for the same amount, payable at sixty days, which he delivered to the holder of the first note, with a request not to be sued on the overdue note, the latter saying that he would surrender the old note when the new note was paid. The holder procured the new note to be discounted at bank, and, at its maturity, it was paid, in part by the maker, in discharge of a debt which in the meantime had become due by him to the maker of the old note, the balance being paid by the holder of the old note. *Held*, in an action by the holder against the indorser of the old note, to recover the amount of the balance paid to take up the new note, that the taking of the new note was an extension of credit to the maker, which discharged the defendant as indorser.

APPEAL by the defendant from a judgment of the Marine Court. The action was brought against the defendant as the indorser of a promissory note for $2,033.60, to recover an unpaid balance of $500. The defendant, by answer, alleged that the note had been fully paid and satisfied by one Schwartz, the maker, and he, the defendant, thereby became, as indorser, fully discharged from liability. The action was tried before a justice without a jury, and, upon the conclusion of the evidence (which is detailed in the opinion of the court), judgment was rendered for the plaintiff.

The defendant appealed to this court.

*Isaac S. Bryan,* for appellant.

*Stilwell & Swain,* for respondent.

BY THE COURT.*—DALY, Chief Justice.—This case appears to have been decided upon the assumption that the note of Simms & Haller, which was payable at a further day, and was for the same sum as the note upon which the defendant is sued as indorser, was received by the plaintiff, merely as collateral security, and not upon any agreement, express or implied, to extend the time for the payment of the note upon which the defendant was indorser.

The circumstances under which the note of Simms & Haller was made and delivered to the plaintiff, are detailed in part by his testimony and in part by that of Schwartz, the maker of the previous note, and of Simms, one of the makers of the new note. There is considerable conflict, not between Simms and Schwartz, but between them and the plaintiff. The plaintiff testified that after the first note was due, he went to Simms & Haller, and asked them if they would give him a note to Schwartz for accommodation, and that he, the plaintiff, would be responsible for it, and would pay the money before it became due:—to let him have their note for $2,000, and that if they did not collect the money from Schwartz, he, the plaintiff, would be responsible for the note. He testified that Simms &

* Present—Daly, Ch. J., Loew and Larremore.

Haller consented to do so, and that afterwards he told Schwartz to go to Simms & Haller, and bring him a note for $2,000; that Simms gave him the note for $2,033.60, which he brought to the plaintiff; that the plaintiff then said that he would keep the new note as collateral security; that Schwartz asked him to give up the old note, and the plaintiff replied that he would keep it as collateral security until the other note was paid, and that when the latter note was paid, he would send the former one, and he added that he simply got the note of Simms & Haller " to make believe."

It appeared by Schwartz' testimony that he had had dealings with Simms & Haller; that no money was due by them to him, when this new note was given, but before it became due, he had sold good to them, which must have amounted to $5,000 or $6,000.

The new note, as appears by the testimony of Simms, was for exactly the same amount as the old one, $2,033.60, a fact which the plaintiff has not denied, although he says that he told Schwartz to bring him a note for $2,000. The new note was dated the 9th of June, 1869, and fell due on the 12th of August thereafter. The plaintiff had it discounted in a bank. When it fell due, Simms & Haller owed Schwartz $1,500 for merchandize, and to enable them to take up this note, they sent to the plaintiff for a check for the balance of it, $533. The plaintiff sent them his check for $530, and they took up the note.

Schwartz testified, as has been stated, that when he gave Simms & Haller's note to the plaintiff, he asked him for the old note, and that the plaintiff said that he would send it to him, but this the plaintiff denied, or, as he testified, said that he would send it, when the other note was paid.

Schwartz admitted that the plaintiff told him to get Simms & Haller's note, and that he, the plaintiff, would not sue upon it, and Schwartz says that he went to Simms, and *with that understanding* got from him the note for $2,033.60.

In respect to the making and delivery to the plaintiff of Simms & Haller's note, Schwartz testified that he called upon the plaintiff and requested him not to sue; that he would pay

the note, and that the plaintiff said that if Schwartz got Simms & Haller's note, so as to raise the money, he would wait. He asked the plaintiff how long a note he wanted, and the latter said, " make it short," and Schwartz then got the second note. This testimony, if uncontradicted, would be decisive as showing conclusively that an extension of time was given to Schwartz upon the old note which would discharge the indorser, but the plaintiff was not allowed to contradict this part of Schwartz' testimony. He was asked if he had a conversation with Schwartz before the new note was given, and he answered that he had. He was then asked if he had told Schwartz that if the latter would get this note (the second note) he would not sue him, but he was not allowed to answer this question, under the defendant's objection. The ruling of the court was erroneous, for that was in substance what Schwartz had testified to, and the plaintiff, for all that we know, might have contradicted Schwartz, if he had been allowed to do so.

But if we assume that the plaintiff would have denied that he told Schwartz that he would not sue him on the note that was due in case he brought him the new note, there is still, in my judgment, sufficient evidence in the case uncontradicted to show that this arrangement was an agreement to give time, which discharged the defendant from his liability as indorser upon the note that was past due.

It is well settled by a long series of cases in this State, that the taking of a new note, payable at a future day, from the debtor, suspends the right of action upon the original note, until the new one falls due; that it operates as an extension of credit by which not merely an ordinary security, but an indorser, not assenting to the transaction, is discharged. (*Hart* v. *Hudson*, 6 Duer, 304, and the cases thus cited.)

Some confusion has arisen by attempts to qualify this rule, which I apprehend may be attributed to confounding our own with the English cases, which are conflicting, as some of them do not give that effect to the taking of a new note, payable at a future day, for the old one, unless there is an express agreement to give time, founded upon a sufficient consideration. Thus in *Pring* v. *Clarkson*, (1 Barn. & Cress. 14,) where the acceptor

of a dishonored bill sent a new one for a larger amount, payable at a future day to the payee, who got it discounted, it was held that this did not discharge the indorser of a previous bill. C. J. Abbott said, that if time had been given, he would have been discharged, but, that the second bill was nothing more than a collateral security, and that the taking of a collateral security from the acceptor would not have that effect. The correctness of this decision has been questioned in a note to Bayley on Bills, (5 Lond. Ed. 345,) and by Mr. Chitty, the learned author of the well-known work on Bills, who makes this observation, the good sense of which is apparent : " that the mere receiving further security, *payable* at a *further day*, would, in general, imply an engagement to wait till it becomes due." (Chitty on Bills, 10 Am. Ed., p. 409.)

In a later case, *Kendrick* v. *Lomax*, (2 Cromp. & Jer. 405) the last indorser of a bill, after it became due, went to the plaintiff with another bill, with the same parties' names, and requested him to renew the first by taking the second bill. The plaintiff hesitated for some time, and ultimately the indorser left the second bill with him. On the trial, Justice Bayley, an eminent authority on the law of bills of exchange, intimated that such a receipt of the second bill would prevent the plaintiff's right of suing on the first, until the second was dishonored, and he left it to the jury to say whether the second was left and received on account of and in renewal of the first. The jury found that it was, and the Judge having told the jury that the plaintiff was entitled to recover the expenses of the first bill, the second having been paid at maturity, they found a verdict for the plaintiff for that amount. But the verdict was set aside, upon the ground that as the plaintiff was precluded from suing on the first bill, until the second matured, he could maintain no action for the expenses, the second bill having been duly paid. " When," says Bayley, J., in delivering an opinion for the entering of a nonsuit, " the plaintiff took the new bill, he virtually agreed, not only to postpone his right to sue on the first, but also to sue for the charges that were accessory to it,"—which is going quite as far as we have gone in this State in the application of the rule that the taking of

the new note suspends, until it falls due, the right to sue upon the previous one.

The qualification of, or rather the attempt to qualify, this rule in this State, was at first simply *dicta*, (*Pring* v. *Clarkson*, and some earlier English cases being referred to in support of it), in *Gahn* v. *Niemcewicz*, (11 Wend, 320); *Elwood* v. *Deifendorf*, (5 Barb. 409) ; and *Wageman* v. *Hoag*, (14 *id.* 239), without any review or consideration of what had previously been decided in our own State in *Herring* v. *Sawyer*, (M. S.); *Putman* v. *Lewis*, (8 Johns, 304); *Schemerhorn* v. *Loines*, (7 *id.* 312, note); *Benedick* v. *Green*, (15 *id.* 250); *Fellow* v. *Prentis*, (3 Denio, 520); and it finally took the form of an express decision in *Taylor* v. *Allen*, (36 Barb. 294), in which it was held that the receipt of a bill or note having time to run, from the party primarily liable on a previous bill or note, does not operate to discharge an indorser on the bill or note so overdue, unless there is an agreement express or implied, that the new bill or draft is in payment of the former, or extending the time of payment in favor of some party who is liable thereon prior to such indorser. In that case, the plaintiff, after the note was due, drew a draft upon the maker for the amount of the note and interest, payable in sixty days after date, without the assent or knowledge of the indorser of the note, which draft the maker accepted; and the court held, that as there was no express agreement to extend the time of the payment on the note overdue, and there was some evidence that the new draft was taken by the plaintiff as collateral to the former note, there was nothing to prevent the plaintiff from enforcing the payment of the old note, the action having been commenced before the draft was due.

I cannot yield my assent to the correctness of this decision. It does not appear from the report of the case what the evidence was, to show that the draft was received by the plaintiff as collateral, and not knowing what it was, it is difficult to see how the case affects the question; for the drawing of a draft by the plaintiff, payable at a future day, for the amount of the note and interest, and the acceptance of that draft by the maker of the note, was in itself an extension of

the time of payment, until the draft became due, and a suspension *ad interim* of the right of action upon the note. (*Myers* v. *Welles*, 5 Hill, 464; *Kendrick* v. *Lomax*, 2 Cromp. & Jer. 405.)

In deciding that the action could be maintained, before the draft became due, the court laid down this proposition, " that where it has been expressly agreed that the new note was received as collateral security to the note overdue, the right of immediate action on the note so overdue is not suspended, and the indorser or surety is not discharged," a proposition which is not sustained, in the terms in which it is expressed, by the authorities cited in support of it.

A new note, payable at a future time, is necessarily collateral to the prior one, where the latter is not given up, and the fact that it is thus collateral has no bearing upon the question of the extension of time, which follows necessarily from taking a new note for the same amount, payable at a future day. It may be that an express understanding that the new note should not affect the security which the creditor already had, would be sufficient evidence of an express agreement, that there was to be no extension of time, and that the creditor was at liberty to sue upon the old note, if so disposed, without waiting until the new one became due, as was, in effect, held by Lord Ellenborough in *Bedford* v. *Deakin*, (2 Starkie, 178); but even this is very doubtful, as it is allowing the party to contradict by parol the plain meaning and legal effect of the written instrument which he takes. (*Hart* v. *Hudson*, 6 Duer, 304; *Fellows* v. *Prentis*, 3 Denio, 514, 517; 1 Greenleaf's Ev. §§ 282, 284; Chitty on Bills, 10th Am. Ed. 142.) It is also to be observed, that this case of *Bedford* v. *Deakin* was but a *nisi prius* decision of Lord Ellenborough's, made more than fifty years ago, when the law in relation to bills of exchange was not as clearly defined, or as well understood, as it is now. Before this decision was made, and after it, there were cases, in which it was held that where a note is due and unpaid, the taking of collateral security by the creditor, such as a bond, an assignment of property or warrant of attorney, etc., is and was no extension of the time

of payment, nor any suspension of his right to sue upon the note. The cases of *Twopenny* v. *Young*, (3 Barn. & Cr. 208); and *Bell* v. *Banks*, (3 Man. & G. 258), are illustrations, and these decisions may have led Lord Ellenborough in *Bedford* v. *Deakin*, (*supra*); Chief Justice Abbott in *Pring* v. *Clarkson*, (*supra*); and Chief Justice Gibbs in *Melvill* v. *Glendening*, (7 Taunt. 126), to apply the same rule where a note payable at a future time is taken, without distinguishing that the two cases are very different. Where a new negotiable note, payable at a future time, is taken by the creditor, he receives some benefit or advantage, as he may use the new note in the market as commercial paper, and, as was done in the case now before us, get it discounted at a bank, and any benefit or advantage however small, is sufficient to constitute a consideration. In the cases of *Fellows* v. *Prentis*, (*supra*), *Hart* v. *Hudson*, (*supra*), and *Watson* v. *Taylor*, (*supra*), the interest upon the old note was computed and added to the amount payable in the new one, so that the new note, if unpaid, would draw a larger amount of interest upon the principal than the old note, which was not only a sufficient consideration to support the implied agreement to give time, but was regarded in *Fellows* v. *Prentis*, (*supra*), by Chancellor Wilmott, and in *Hart* v. *Hudson*, (*supra*), by Chief Justice Duer, as in fact constituting a new contract, as the new note included more than was recoverable under the old one.

The distinction which exists, where a note, payable at a future time, is taken for the amount of an existing debt, was recognized before Lord Ellenborough's time, by Lord Kenyon, in *Stedman* v. *Gooch*, (1 Esp. R. 5), and he stated the true rule succinctly in these words: "To this effect the law is clear, that if in payment of a debt, the creditor is content to take a bill or note, payable at a future day, he cannot legally commence an action, until such bill or note becomes payable, or default is made in the payment."

In *Melvill* v. *Glendening*, (*supra*), bills of exchange were given for the original debt. It does not appear very clearly, either from the report or from the opinion of Chief Justice Gibbs, what the transaction really was. As I understand the

case, it appears to have been insisted that it was agreed, from the giving of the bills of exchange, that the creditor would not proceed against the debtor, unless it should appear that the bills were not duly honored; but it would seem from the opinion of the court, that the debtor said, "I throw myself on your mercy, but to induce you not to proceed, I put these securities into your hands;" and the plaintiff swore expressly, that he never made any agreement to give time. The Chief Justice held, that he had not precluded himself from proceeding at any moment against the defendant upon the original debt, a decision which I consider questionable; first, because, if the bills were payable at a future day, it was allowing the plaintiff to contradict the legal effect of the instrument, which he agreed to take and hold, and, second, even upon the parol evidence he was concluded.

The language of the debtor was equivalent to saying, "I am at your mercy; you may proceed against me if you will, but to induce you not to do so, I put these securities into your hands." It was in the creditor's power to refuse to show any mercy, but, in my judgment, when he took the securities, it was impliedly agreeing that he would not proceed, but would wait until the bill of exchange fell due. Indeed that case, as well as the one now before us, is a good illustration of the propriety of not allowing a party who takes a new negotiable note, payable at a future day, to show by parol that he did not mean by taking it to wait until the note became due.

In *Place* v. *McIlvaine* (1 Daly, 266), the maker of a note under protest, sent his negotiable check, dated nine days ahead, for the amount of the note, to the plaintiff, in a letter, wherein he was requested to accept it as a favor, and stating that when the check was paid, he would call for the note. The creditor returned no answer, but kept the check and had it presented upon the day that it was payable, at the bank, when payment was refused. We held, that, upon this state of facts, an agreement to give time was implied as a conclusion of law, and that having been done without the knowledge of the indorser of the note, the latter was discharged.

The case was carried to the Court of Appeals (38 N. Y. 96),

and our decision was affirmed. Justice Miller delivered a dissenting opinion, founded in part upon the decision of the Supreme Court in *Taylor* v. *Allen* (36 Barb. 294), to which I have referred, and in which he approves of the proposition in that case which I have commented upon, insisting that there must be an agreement, express or implied, to give time—one that is obligatory upon the creditor, and which is founded upon a sufficient consideration, and that no such agreement could be inferred by the omission of the plaintiff to return the check, or by his having it presented at the bank upon the day when it was payable. But Judge Grover, by whom the opinion of the court was delivered, and with whom, it would seem, the rest of the court agreed, held, on the contrary, that these circumstances were sufficient to show that the plaintiff had accepted the check, and the affirmance of the judgment was put up on the plain ground that when a creditor takes the note of his debtor, payable at a future day, he *thereby* suspends his right of action upon the debt until the maturity of the note, so that it may now be regarded as settled in this State that such is the legal effect of the taking of a new note from the debtor, payable at a future day, and that when it is done without the knowledge or consent of an indorser of the old note, he is discharged.

Such was the legal effect here when the note of Simms & Haller was made and delivered to the plaintiff. The giving of this note did not originate with the debtor, but the making of it was the result of a plan devised by the plaintiff, by which he could have any indebtedness, which might arise in the interim on the part of Simms & Haller to Schwarts, applied towards the payment of the debt which Schwartz owed to him.

During the sixty days that the new note had to run Simms & Haller became indebted to Schwartz in the sum of $1,500, for merchandise which they had received from him, and by the prior understanding alike of the plaintiff, Schwartz, and Simms & Haller, they applied the sum of $1,500 toward the payment of their note, which the plaintiff had got discounted in the Bull's Head Bank, and which they took up with the aid of the plaintiff's check for $530. The very substantial consideration which the plaintiff derived was, that he had a note made by

Simms & Haller, through the instrumentality of which he directed a debt of $1,500 which otherwise might have been paid to Schwartz, towards the payment of the debt which Schwartz owed him. This was the very object for which this note was made. There was nothing, then due by Simms & Haller to Schwartz, but they were dealing with him, and a subsequently accruing indebtedness was anticipated, in view of which they were willing to give their note for the plaintiff's benefit, with the understanding that any indebtedness which might arise during the time it had to run might be applied by them to the taking up of the note, or, if there were none, that the plaintiff should take it up himself, or make up the deficiency, which he did.

The plaintiff meant to wait, and did wait, until that note became due, that he might have the benefit of the accruing indebtedness. The effect necessarily was to extend the time. There was an ample consideration for his doing so, and, when he did, he discharged the defendant from his liability as indorser.

The judgment should be reversed.

Judgment reversed.